## MOORE, PRESIDENT OF THE ODD-LOT COTTON EXCHANGE OF NEW YORK, v. NEW YORK COTTON EXCHANGE ET AL.

APPEAL FROM THE CIRCUIT COURT OF APPEALS FOR THE SECOND CIRCUIT.

No. 200. Argued March 9, 1926.—Decided April. 12, 1926.

1. Relief, under the Trade Commission Act, against unfair competition, must be afforded in the first instance by the Commission. P. 603.

2. A decree of the Circuit Court of Appeals affirming orders which denied an interlocutory injunction to the plaintiff and granted one to the defendant, and remanding the cause with direction to dismiss the bill and make the injunction permanent, is final for purposes of appeal. *Id.*

3. Transactions between the members of the New York Cotton Exchange, consisting of agreements made on the spot for purchase and sale of cotton for future delivery, the cotton to be represented by warehouse receipts issued by a licensed warehouse in the Port of New York and to be deliverable from such warehouse, are local transactions not involving interstate commerce. *Id.*

4. The fact that such agreements are likely to give rise to interstate shipments does not make the agreements interstate commerce, such shipments being merely incidental. *Id.*

5. A contract between the cotton exchange and a telegraph company, under which the exchange at its own expense collects its quotations of such sales and delivers them to the telegraph company, which transmits them like other messages, at the charges of the recipients, to such persons only as the exchange approves, the telegraph paying the exchange for the privilege of having the business,—is not a violation of the Sherman Anti-Trust Act. P. 604.

6. In thus furnishing quotations to some and refusing them to others, the exchange is but exercising the ordinary right of a vendor of news; the telegraph company, as carrier, can not deliver the messages to others than those designated by the seller; and the contract between exchange and telegraph does not, in purpose or effect, operate directly or unreasonably to restrain interstate commerce, or to create a monopoly. P. 605.

7. A bill setting up a claim under a federal statute which, though unjustified, is not devoid of all color of merit, invokes the federal

jurisdiction to decide the claim, and a decision dismissing the bill upon rejection of the claim is not a dismissal for want of jurisdiction. P. 608.

8. Under Equity Rule 30, requiring that the answer state any counterclaim " arising out of the transaction which is the subject matter of the suit," a cotton exchange, in a suit against it and a telegraph company to cancel a contract between them respecting the sending out of exchange quotations and for a mandatory injunction to compel delivery of quotations to plaintiff, was entitled to seek by counterclaim an injunction restraining the plaintiff from wrongfully obtaining its quotations. P. 609.

296 Fed. 61, affirmed.

APPEAL from a decree of the Circuit Court of Appeals which on interlocutory appeal sustained orders of the District Court (291 Fed. 681) refusing an interlocutory injunction to the plaintiff and granting one for a defendant on a counter claim, and which directed a final decree dismissing the bill and making the injunction permanent. The suit was based on the Sherman Law and primarily concerned the validity of a contract between the New York Cotton Exchange and the Western Union Telegraph Company for the distribution of quotations of that exchange to such persons only as received its approval.

*Mr. John M. Coleman,* with whom *Mr. Oscar B. Bergstrom* was on the brief, for appellant.

Under the circumstances, the continuous cotton quotations, as made and issued by the New York Cotton Exchange, are an instrumentality of interstate commerce—as much so as a railroad car or telegraph wire. It is true that the cotton sought to be bought and sold is not yet in transit in interstate commerce, but its initiation into interstate commerce depends upon the use of these quotations, which the appellees furnish to appellant's competitors, but deny to appellants, and hence restrain the appellant from competing in such interstate commerce.

The question here is not whether the quotations arise out of local transactions or otherwise, but the nature and functions of the quotations themselves, after they have been created, and become a distinct property or instrumentality. The fact that the quotations arise out of local transactions can have no greater bearing upon the question as to whether they constitute interstate commerce, than the fact that cotton shipped in interstate commerce has been grown on a plantation within the State as a local production.

The gravamen of the bill is, that the New York Cotton Exchange, in formulating quotations of actual transactions and selling the quotations to individuals and other exchanges in the State of New York, and in other States, for use in purchase, sale, and transportation of cotton, is engaged in interstate commerce as to these particular quotations,—which is an entirely different question from transactions taking place on the board of the exchange.

The Western Union Telegraph Company, having acquired the exclusive right to such quotations, is engaged in selling the same in all States of the United States where there are dealings in and transportation of cotton, and in transmitting such quotations over its wires, and so is engaged in interstate commerce with reference to these particular quotations.

The cases of *Hopkins* v. *United States,* 171 U. S. 578, and *Anderson* v. *United States,* 171 U. S. 604, have often been considered by this Court, and have been narrowly limited to their facts. *Stafford* v. *Wallace,* 259 U. S. 44; *Swift* v. *United States,* 196 U. S. 375. The case at bar is much stronger than *Ramsay & Co.* v. *Associated Bill Posters,* 260 U. S. 501, and comes within the decisions quoted above, and *Binderup* v. *Pathe Exchange,* 263 U. S. 491.

The allegations of the bill show that the continuous quotations constitute an absolute monopoly of the sale

and transportation of cotton in interstate commerce, and that, by confining such quotations to its members and its selected customers, the Exchange restrains and prevents all competition in the cotton industry. It is conceded that no person can conduct such a business without the use of such quotations. The Exchange, being engaged in the business of selling its quotations, cannot lawfully discriminate in such a manner as to produce a monopoly in the cotton industry. *United States* v. *Patten*, 226 U. S. 525.

Assuming that the continuous cotton quotations are instrumentalities of interstate commerce, and have been dedicated to that service by the voluntary act of the owner, appellant contends that any act of the owner, tending to create a monopoly in the cotton industry, or imposing a burden upon, or restriction in, the free flow of commerce in such industry among the States, constitutes a violation of the Sherman Anti-Trust Law, and may be enjoined under the Clayton Act. Under the contract, the Exchange has sold the continuous cotton quotations to the Telegraph Company for $27,500 per annum The Telegraph Company is authorized to resell the quotations at any price it sees fit, excepting, however, the members of the Cotton Exchange, to whom the resale price is fixed. The Cotton Exchange has no pecuniary interest in such resale. It has parted with its title to the quotations. It has, however, reserved the right to select the persons to whom the Telegraph Company may resell such quotations. The reservation is arbitrary and not in anywise conditional. See *Strauss* v. *Victor Co.*, 243 U. S. 490; *Bauer* v. *O'Donnell*, 229 U. S. 1.

The Telegraph Company was not the agent of the Exchange, but by the purchase of the quotations became and was the owner of them. The Telegraph Company is a *quasi* public service corporation, and when it engaged in the business of selling cotton quotations, and

transmitting the same over its wires, became bound, as a condition of its corporate existence, to furnish such quotations to all persons on equal basis. As a public service corporation, it was bound to serve all to the extent of its capacity or none. *Doty v. American Tel. & Tel. Co.,* 123 Tenn. 320; *Western Union Tel. Co. v. Foster,* 224 Mass. 365; *Thomas v. Railway Co.,* 101 U. S. 83, and other cases.

The court had no jurisdiction of the counterclaim because, first, it does not arise out of any transaction between the parties which is the subject matter of the suit, second, the counterclaim is not one which might be the subject of an independent suit in equity against the appellant in a federal court. *Standard Paint Co. v. Trinidad Asphalt Co.,* 220 U. S. 446; *Ayers v. Wiswall,* 112 U. S. 190; *Merchants Co. v. Clow,* 204 U. S. 290; *U. S. Boat Co. v. Kronche Hardware Co.,* 234 Fed. 868; *Engineering Co. v. Gallion Truck Co.,* 243 Fed. 407; *Geneva Furniture Co. v. Karpen,* 238 U. S. 254; *Cushman v. Atlantis Pen Co.,* 164 Fed. 94; *National Casket Co. v. Brooklyn Casket Co.,* 185 Fed. 533; *Electric Boat Co. v. Lake Torpedo Boat Co.,* 215 Fed. 377; *Johnston v. Brass Goods Mfg. Co.,* 201 Fed. 368; *Keasby Co., v. Phillip Carey Co.,* 113 Fed. 43; *King & Co. v. Englander,* 133 Fed. 416; *Mecky v. Grabowski,* 177 Fed. 591; *Burt v. Smith,* 71 Fed. 161.

*Mr. George W. Wickersham,* with whom *Messrs. Henry W. Taft* and *George Coggill* were on the brief, for New York Cotton Exchange, appellee.

This suit is not sustainable under the federal Anti-Trust Laws. *Standard Oil Co. v. United States,* 221 U. S. 1; *United States v. Amer. Tobacco Co.,* 221 U. S. 106; *United States v. Union Pacific R. R. Co.,* 226 U. S. 61; *United States v. Reading Co.,* 226 U. S. 324; *Nash v. United States,* 229 U. S. 373; *Eastern States Lumber Assn. v.*

*United States,* 234 U. S. 600; *United States* v. *Joint Traffic Assn.,* 171 U. S. 505; *Hopkins* v. *United States,* 171 U. S. 578; *Anderson* v. *United States,* 171 U. S. 604; *Board of Trade* v. *United States,* 246 U. S. 231.

In determining whether the contract is within the statute, all the facts and circumstances existing at the time of its enactment, as well as its effect, are to be taken into consideration. *Anderson* v. *United States,* 171 U. S. 604; *Cont. Wall Paper Co.* v. *Voight & Sons Co.;* 212 U. S. 227; *United States* v. *St. Louis Terminal,* 224 U. S. 383; *United States* v. *Union Pacific R. R. Co.,* 226 U. S. 61; *United States* v. *Reading Co.,* 226 U. S. 324; *Swift* v. *United States,* 196 U. S. 375.

The contract does not undertake to fix the prices which the Telegraph Company must exact from those desiring the continuous or other quotations. It does fix the maximum price to be charged members of the Exchange, but does not prescribe minimum prices to anybody. *Bobbs-Merrill Co.* v. *Straus,* 210 U. S. 339; *Dr. Miles Medical Co.* v. *Park & Sons Co.,* 220 U. S. 373; *Bauer & Cie* v. *O'Donnell,* 229 U. S. 1; *Straus* v. *Am. Publishers Assn.,* 231 U. S. 222; *Straus* v. *Victor Co.,* 243 U. S. 490; *Boston Store* v. *Am. Graphophone Co.,* 246 U. S. 8; *United States* v. *Schrader's Sons, Inc.,* 252 U. S. 85. The contract is but a normal method of accomplishing a highly beneficial purpose—the prevention of the use of quotations in bucket shops. As such the contract is not within § 1 of the Sherman Act as construed by decisions of this Court already cited. Nor can the contract be construed as an attempt to monopolize interstate commerce within § 2 of the Sherman Anti-Trust Act. The quotations of the Cotton Exchange, when collected and distributed under the restrictions prescribed by this contract, are property and belong exclusively to that Exchange. *Board of Trade* v. *Christie,* 198 U. S. 236; *Hunt* v. *New York Cotton Exchange,* 205 U. S. 322.

In legal effect, this is a contract by which the Telegraph Company, as the carrier, agrees to transmit this news for the Exchange to certain persons to be designated by it, and to accept from the Exchange as compensation for the service all that can be realized from the quotations in excess of $27,500 per year, the Telegraph Company guaranteeing that the distribution shall net the Exchange that sum. In other words the Exchange is the real distributor of the quotations, and the Telegraph Company is an agency employed by the Exchange to facilitate such distributions. A similar contract was thus construed in *Matter of Renville*, 46 App. Div. 37. See also *Wilson* v. *Commercial Telegram Co.*, 3 N. Y. Supp. 633, and *Bryant* v. *Western Union Tel. Co.*, 17 Fed. 825.

As the owner of the quotations, the Exchange is under no legal duty to sell to any particular person nor to sell to all because it sells to some. *Whitwell* v. *Cont. Tobacco Co.*, 125 Fed. 454; *United States* v. *Trans-Missouri Freight Assn.*, 166 U. S. 290; *Lumber Assn.* v. *United States*, 234 U. S. 600; *United States* v. *Colgate & Co.*, 250 U. S. 300; *United States* v. *Schrader's Son, Inc.*, 252 U. S. 85; *Bitterman* v. *L. & N. R. R. Co.*, 207 U. S. 205; *Federal Trade Comm.* v. *Curtis Pub. Co.*, 260 U. S. 568; *Board of Trade* v. *Christie Co.*, 198 U. S. 236; *Miles Medical Co.* v. *Park & Sons Co.*, 220 U. S. 373; *New York, etc., Exchange* v. *Board of Trade*, 127 Ill. 153.

The following cases uphold the right of an Exchange— at least in the absence of affirmative legislation—to say to whom its quotations shall go, especially where, as in the case at bar, they are collected by the Exchange itself. *Board of Trade* v. *Christie*, 116 Fed. 944; *Matter of Renville*, 46 App. Div. 37; *Met. Grain & Stock Exch.* v. *Board of Trade*, 15 Fed. 847; *Bryant* v. *Western Union Co.*, 17 Fed. 825; *Marine Grain & Stock Exch.* v. *Western Union Co.*, 22 Fed. 23; *Wilson* v. *Comm. Tel. Co.*, 3 N. Y. Supp. 633.

That private property may be impressed with a public use only by legislative act has also been decided. *Express Cases,* 117 U. S. 1; *A. T. & S. F. R. Co.* v. *D. & N. O. R. Co.,* 110 U. S. 667; *State* v. *Associated Press,* 159 Mo. 410; *Ladd* v. *S. C. P. & M. Co.,* 53 Tex. 172; *Del. L. & W. R. R.* v. *Central Stock Yards Co.,* 45 N. J. Eq. 50; *Heim* v. *N. Y. Stock Exchange,* 118 N. Y. Supp. 591.

Compare *New York, etc., Exchange* v. *Board of Trade,* 127 Ill. 153, and *Amer. Live Stock Commission Co.* v. *Chicago Live Stock Exchange,* 143 Ill. 210.

The quotations, not being impressed with a public use while in the possession of the Exchange, do not become thus open to all when given to the Telegraph Company. The Exchange is the distributor through the agency of the Telegraph Company. *Matthews* v. *Associated Press,* 136 N. Y. 333; *State* v. *Associated Press,* 159 Mo. 410. The Telegraph Company under this contract acquires, if any interest, only a restricted one—a right to sell to certain designated persons; and when it has done this its entire interest in the quotations is gone. *Bitterman* v. *L. & N. R. R. Co.,* 207 U. S. 205. Furthermore, if the Telegraph Company be adjudged the seller of the quotations, it is not, in delivering them to the designated persons, acting in its public capacity as a common carrier, but merely as a dealer in news, and it should not be required to give to others what it has not itself legally acquired. Again, there are certain things a carrier may do, which are not subject to the rule that all persons must be treated by it alike. *Missouri Pacific R. R.* v. *Nebraska,* 164 U. S. 403; *Express Cases,* 117 U. S. 1; *Donovan* v. *Penn. Co.,* 199 U. S. 279; *Old Colony R. R.* v. *Tripp,* 147 Mass. 35; *Sargent* v. *Boston & Lowell R. R.,* 115 Mass. 416. A telegraph company, although a common carrier, as respects the transmission of messages for hire, is not such in its purchase and sale of news. *Brad-*

*ley* v. *Western Union Co.,* 8 Ohio Dec. 707; *Sterrett* v. *Telegraph Co.,* 18 Weekly Notes of Cas. 77. See also *Ches. & Pot. Tel. Co.* v. *Manning,* 186 U. S. 238.

The transactions on which the amended bill is based do not involve interstate commerce. *Hopkins* v. *United States,* 171 U. S. 578; *Anderson* v. *United States,* 171 U. S. 604; *Ware & Leland* v. *Mobile County,* 209 U. S. 405; *Hill* v. *Wallace,* 259 U. S. 44; *Board of Trade* v. *Christie Co.,* 198 U. S. 236.

The Circuit Court of Appeals had jurisdiction to entertain appellees' counterclaim and to grant a final injunction thereon.

*Mr. Francis R. Stark* filed a brief for the Western Union and the Gold Stock Telegraph Companies, appellees.

MR. JUSTICE SUTHERLAND delivered the opinion of the Court.

The Odd-Lot Cotton Exchange is an organization whose members make contracts for themselves and for customers for the future delivery of cotton in lots of not more than 100 nor less than 10 bales. The members of the New York Cotton Exchange, which is organized under a special act of the New York Legislature, c. 365, Laws 1871, p. 724, also make contracts for the purchase and sale of cotton for future delivery, either for themselves or for customers; such contracts being made only upon open *viva voce* bidding, between certain hours of the day and in the rooms of the exchange in New York City. Quotations of prices thus established are collected by the New York exchange, and, under the terms of a written agreement with that exchange, the Western Union company pays $27,500 annually for the privilege of receiving and distributing them throughout the United States, to such persons as the exchange approves. Applicants for such quotations must sign an application and agree not to

use them in connection with a bucket shop or to give them out to other persons. The Gold & Stock Telegraph Company, a New York corporation and a subsidiary of, and controlled by, the Western Union, is engaged in disseminating quotations of cotton prices by means of ticker service, owned and operated by it, tickers being located in exchanges, brokerage houses and elsewhere in the several states. The Odd-Lot exchange made application to the two telegraph companies for this service in the form required by the contract with the New York exchange. It was refused, the New York exchange having declined to give its consent to the installation on the ground, among others, that, after investigation, it had ascertained that the Odd-Lot had succeeded another exchange which had been convicted of conducting a bucket shop and that the Odd-Lot had in its membership many members of the convicted exchange and was organized as a cover to enable its members to engage in the same unlawful business.

Federal jurisdiction is invoked under the anti-trust laws of the United States. The bill avers that the contracts between members of the Odd-Lot are chiefly for producers of cotton and others located, resident and in business in other states than New York, and are made and effectuated by communications through the Western Union by wire; that such contracts concern and include deliveries of cotton from cotton-growing states to and into the State of New York, involving actual interstate shipment and transportation; that the New York exchange has a monopoly upon the receipt and dissemination of cotton price quotations, through which quotations and prices of cotton, both spot and for future delivery, are influenced, guided and fixed in the exchanges and markets throughout the United States; that the contract with the Western Union is in restraint of interstate trade and commerce in cotton and was entered into for

the purpose of monopolizing and restraining that commerce. There is an attempt to allege unfair methods of competition, which may be put aside at once, since relief in such cases under the Trade Commission Act must be afforded in the first instance by the commission.

The prayer is for a decree cancelling the Western Union contract, adjudging the New York Cotton Exchange to be a monopoly, restraining appellees from refusing to install a ticker and furnish the Odd-Lot and its members, as they do others, with continuous cotton quotations, and for other relief.

The answer, in addition to denials and affirmative defensive matter, sets up a counterclaim to the effect that the Odd-Lot, though it had been refused permission to use the quotations of the New York exchange, was purloining them, or receiving them from some person who was purloining them, and giving them out to its members, who were distributing them to bucket ships, with the consequent impairment of the value of appellees' property therein. An injunction against the continuance of this practice was asked.

Both parties moved for interlocutory injunctions. The district court denied appellant's motion and granted that of appellees. 291 Fed. 681. Upon appeal, both orders were affirmed by the court of appeals. 296 Fed. 61. By stipulation of the parties authorizing such action, the court of appeals remanded the cause with directions to the district court to enter a final decree dismissing the bill and making permanent the injunction granted appellees. Since this left to the district court only the ministerial duty of complying with the mandate, the decree below, for purposes of appeal, is final. *Gulf Refining Co.* v. *United States,* 269 U. S. 125, 136.

*First.* We are of opinion that upon the allegations of the bill no case is made under the federal anti-trust laws.

The only possible ground on which the suit can be maintained rests in the claim that there is a violation of §§ 1 and 2 of the Sherman Anti-Trust Act, c. 647, 26 Stat. 209, for which appellant is entitled to sue under § 16 of the Clayton Act, c. 323, 38 Stat. 737. And whether this claim is tenable turns alone upon the effect of the contract between the New York exchange and the Western Union. Independent of that contract, there is no averment of fact in the bill upon which a violation of the Anti-Trust Act can be predicated. The New York exchange is engaged in a local business. Transactions between its members are purely local in their inception and in their execution. They consist of agreements made on the spot for the purchase and sale of cotton for future delivery, with a provision that such cotton must be represented by a warehouse receipt issued by a licensed warehouse in the Port of New York and be deliverable from such warehouse. Such agreements do not provide for, nor does it appear that they contemplate, the shipment of cotton from one state to another. If interstate shipments are actually made, it is not because of any contractual obligation to that effect; but it is a chance happening which cannot have the effect of converting these purely local agreements or the transactions to which they relate into subjects of interstate commerce. *Ware & Leland* v. *Mobile County,* 209 U. S. 405, 412–413. The most that can be said is that the agreements are likely to give rise to interstate shipments. This is not enough. *Engel* v. *O'Malley,* 219 U. S. 128, 139. See also *Hopkins* v. *United States,* 171 U. S. 578, 588, 590; *Anderson* v. *United States,* 171 U. S. 604, 615–616.

It is equally clear that the contract with the Western Union for the distribution of the quotations to such persons as the New York exchange shall approve does not fall within the reach of the Anti-Trust Act. Under that contract, the exchange at its own expense collects the quo-

tations and delivers them to the telegraph company for distribution to such approved persons. The real distributor is the exchange; the telegraph company is an agency through which the distribution is made. In effect, the exchange hands over the quotations, as it might any other message, to the telegraph company for transmission, charges to be collected from the receivers. The payment which the telegraph company makes to the exchange is for the privilege of having the business. It does not alter the character of the service rendered.

In furnishing the quotations to one and refusing to furnish them to another, the exchange is but exercising the ordinary right of a private vendor of news or other property. As a common carrier of messages for hire, the telegraph company, of course, is bound to carry for all alike. But it cannot be required—indeed, it is not permitted—to deliver messages to others than those designated by the sender. We fully agree with what is said upon similar facts by Judge Ingraham in *Matter of Renville,* 46 App. Div. 37, 43–44:

"I cannot see that it makes any difference whether a despatch is given to a telegraph company to be communicated to a single individual, or to be communicated to ten, a hundred or a thousand individuals. Under this agreement between the stock exchange and the respondents, certain information is given to the telegraph company to be communicated to individuals or corporations designated by the stock exchange. Whether we call this information a special despatch or general information which the stock exchange desires to communicate, seems to me to be entirely immaterial. The fact that the telegraph company pays to the stock exchange a certain sum of money for the information which it receives to transmit is also immaterial. The substance is that those to whom this information is directed to be given by the stock exchange are willing to pay the stock exchange for such

information, and are also willing to pay the telegraph company the expense of transmitting the information. The information delivered to the respondents for transmission is a communication which the stock exchange wishes to transmit to the persons it designates and to no one else. I can see no reason why the stock exchange should be required to furnish the appellant with this information, which relates solely to its own business upon its own property, or why the respondents should be required to violate their agreement with the stock exchange and the law of this State, and furnish to the appellant information which had been communicated to the respondents by the stock exchange for a specific purpose and none other."

So far as the exchange is concerned, the evident purpose of the contract was to further and protect its business. The terms are entirely appropriate and legitimate to that end. The effect of the making and execution of the contract upon interstate trade or commerce, if any, is indirect and incidental. Neither in purpose nor effect does it directly or unreasonably restrain such commerce or operate to create a monopoly. It has long been settled by this court that under such circumstances a trader or manufacturer engaged in a purely private business may freely exercise his independent discretion in respect of the persons with whom he will deal and to whom he will sell and refuse to sell. Cases to this effect are cited in the opinion of the court below. It is unnecessary to repeat, or add to, those citations here. It is enough to refer to the decision of this court in *Board of Trade* v. *Christie Grain & Stock Co.,* 198 U. S. 236, 250, 252, where, in all essential particulars, the question now under review was presented and determined. There a suit was brought by the Board of Trade to enjoin the defendants from getting and distributing price quotations on sales of grain and provisions for future delivery. They were

obtained in some way not disclosed, but not from either of the telegraph companies authorized by contract to distribute them, as the Western Union was authorized here. This court held that the collection of quotations belonged to the Board and was entitled to protection; that the Board did not lose its rights by communicating the information to others in confidential relations to it and under contract not to make it public; and that defendants should be enjoined. Holding the contracts with the telegraph companies not to be in conflict with the Anti-Trust Act, it was said (p. 252):

" But so far as these contracts limit the communication of what the plaintiff might have refrained from communicating to any one, there is no monopoly or attempt at monopoly, and no contract in restraint of trade, either under the statute or at common law. *Bement* v. *National Harrow Co.,* 186 U. S. 70; *Fowle* v. *Park,* 131 U. S. 88; *Elliman* v. *Carrington,* [1901] 2 Ch. 275. It is argued that the true purpose is to exclude all persons who do not deal through members of the Board of Trade. Whether there is anything in the law to hinder these regulations being made with that intent we shall not consider, as we do not regard such a general scheme as shown by the contracts or proved. A scheme to exclude bucket shops is shown and proclaimed, no doubt—and the defendants, with their contention as to the plaintiff, call this an attempt at a monopoly in bucket shops. But it is simply a restraint on the acquisition for illegal purposes of the fruits of the plaintiff's work. *Central Stock & Grain Exchange* v. *Board of Trade,* 196 Illinois, 396. We are of opinion that the plaintiff is entitled to an injunction as prayed."

*Second.* The decree granting an injunction upon the counterclaim is challenged on the grounds, shortly stated: (1) that the court, having dismissed the bill for lack of jurisdictional facts, should have dismissed the counter-

claim also, there being no independent basis of jurisdiction; (2) that the counterclaim does not arise out of any transaction which is the subject-matter of the suit; and (3) that the decree is not justified by the allegations of the counterclaim or the proof.

1. We do not understand that the dismissal was for the reason that there was an absence of jurisdiction to entertain the bill. What the court held was that the facts alleged were insufficient to establish a case under the Anti-Trust Act. Whether the objection that a bill of complaint does not state a case within the terms of a federal statute challenges the jurisdiction or goes only to the merits, is not always easy to determine. The question has been recently reviewed at some length by this court in *Binderup* v. *Pathe Exchange,* 263 U. S. 291, 305, and the distinction pointed out as follows:

" Jurisdiction is the power to decide a justiciable controversy, and includes questions of law as well as of fact. A complaint setting forth a substantial claim under a federal statute presents a case within the jurisdiction of the court as a federal court; and this jurisdiction cannot be made to stand or fall upon the way the court may chance to decide an issue as to the legal sufficiency of the facts alleged any more than upon the way it may decide as to the legal sufficiency of the facts proven. Its decision either way upon either question is predicated upon the existence of jurisdiction, not upon the absence of it. Jurisdiction, as distinguished from merits, is wanting only where the claim set forth in the complaint is so unsubstantial as to be frivolous or, in other words, is plainly without color of merit. [Citing cases.] In that event the claim of federal right under the statute, is a mere pretense and, in effect, is no claim at all."

Here, facts are set forth in a serious attempt to justify the claim that the federal statute has been violated: and, while we hold them to be insufficient to sustain the claim,

we are not prepared to say that they are so obviously insufficient as to cause it to be without color of merit and, in effect, no claim at all.    We think there is enough in the bill to call for the exercise of the jurisdiction of a federal court to decide, upon the merits, the issue of the legal sufficiency of the allegations to make out the claim of federal right.    This was evidently the view of the court below, and we construe its mandate as a direction to dismiss the bill on the merits and not for want of jurisdiction.

2. Equity rule 30 in part provides:

" The answer must state in short and simple form any counter-claim arising out of the transaction which is the subject matter of the suit, and may, without cross-bill, set up any set-off or counter-claim against the plaintiff which might be the subject of an independent suit in equity against him, and such set-off or counter-claim, so set up, shall have the same effect as a cross-suit, so as to enable the court to pronounce a final decree in the same suit on both the original and the cross-claims."

Two classes of counterclaims thus are provided for: (a) one " arising out of the transaction which is the subject matter of the suit," which must be pleaded, and (b) another " which might be the subject of an independent suit in equity " and which may be brought forward at the option of the defendant.    We are of opinion that this counterclaim comes within the first branch of the rule; and we need not consider the point that, under the second branch, federal jurisdiction independent of the original bill must appear, as was held in *Cleveland Engineering Co.* v. *Galion D. M. Truck Co.,* 243 Fed. 405, 407.

The bill sets forth the contract with the Western Union and the refusal of the New York exchange to allow appellant to receive the continuous cotton quotations, and asks a mandatory injunction to compel appellees to furnish them.    The answer admits the refusal and justifies it. The counterclaim sets up that, nevertheless, appellant is

purloining or otherwise illegally obtaining them, and asks that this practice be enjoined. "Transaction" is a word of flexible meaning. It may comprehend a series of many occurrences, depending not so much upon the immediateness of their connection as upon their logical relationship. The refusal to furnish the quotations is one of the links in the chain which constitutes the transaction upon which appellant here bases its cause of action. It is an important part of the transaction constituting the subject-matter of the counterclaim. It is the one circumstance without which neither party would have found it necessary to seek relief. Essential facts alleged by appellant enter into and constitute in part the cause of action set forth in the counterclaim, That they are not precisely identical, or that the counterclaim embraces additional allegations, as, for example, that appellant is unlawfully getting the quotations, does not matter. To hold otherwise would be to rob this branch of the rule of all serviceable meaning, since the facts relied upon by the plaintiff rarely, if ever, are, in all particulars, the same as those constituting the defendant's counterclaim. Compare *The Xenia Branch Bank* v. *Lee,* 7 Abb. Pr. 372, 390-394. And see generally, *Cleveland Engineering Co.* v. *Galion D. M. Truck Co., supra,* p. 408; *Champion Spark Plug Co.* v. *Champion Ignition Co.,* 247 Fed. 200, 203-205.

So close is the connection between the case sought to be stated in the bill and that set up in the counterclaim, that it only needs the failure of the former to establish a foundation for the latter; but the relief afforded by the dismissal of the bill is not complete without an injunction restraining appellant from continuing to obtain by stealthy appropriation what the court had held it could not have by judicial compulsion.

3. Finally, the point is made that the court of appeals erred in directing the district court to enter a final decree making permanent the interlocutory injunction granted

· on the counterclaim because not warranted by the allega-
.tions or proof.    Evidently for the purpose .of facilitating
an appeal to this court, appellant, by stipulation, con-
sented that the affidavits. filed in support of the prelimi-
nary application should be treated as testimony in support
of the counterclaim and, on this, that the court of appeals .
might direct the entry of a final decree.   The district court
thought the pleadings and affidavits sufficient to warrant
a preliminary injunction and the court of appeals thought
them sufficient to sustain a decree making that injunction
permanent.   We see no reason to differ with their con-
clusions.

*Decree affirmed.*